**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PARVIN FOROOZESH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **2:03cv1703** |
| ) | |
| **LOCKHEED MARTIN OPERATIONS** ) | |
| **SUPPORT, INC., a/k/a LOCKHEED** ) | |
| **MARTIN TECHNOLOGY SERVICES,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Before the Court for consideration and disposition are LOCKHEED MARTIN

OPERATIONS SUPPORT, INC.'S MOTION FOR SUMMARY JUDGMENT (Document No.

55), LOCKHEED MARTIN OPERATIONS SUPPORT, INC.'S MEMORANDUM OF LAW IN

SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (Document No. 56),

PLAINTIFF'S RESPONSE OPPOSING LOCKHEED MARTIN OPERATIONS SUPPORT,

INC.'S MOTION FOR SUMMARY (Document No. 61), PLAINTIFF'S BRIEF IN

OPPOSITION TO LOCKHEED MARTIN OPERATIONS SUPPORT, INC.'S MOTION FOR

SUMMARY JUDGMENT (Document No. 62), PLAINTIFF'S RESPONSES TO LOCKHEED

MARTIN OPERATIONS SUPPORT, INC.'S CONCISE STATEMENT OF MATERIAL

FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT UNDER LOCAL

RULE 56.1 (Document No. 63) and LOCKHEED MARTIN OPERATIONS SUPPORT, INC.'S

REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

(Document No. 64).  The issues have been fully briefed, and the matter is ripe for disposition.

For the reasons which follow, the Motion for Summary Judgment will be granted in part and

denied in part.

Background

Construed in the light most favorable to Plaintiff, the record facts are as follows:

Plaintiff Parvin Foroozesh ("Plaintiff") was employed by defendant Lockheed Martin Operations

Support ("Defendant") as a LAN/WAN administrator[1] from December of 1997 until her employment was terminated in January of 2002.  Pltf's Stmt. of Facts at ¶ 1.  Plaintiff is a female of Iranian descent, with a bachelor's degree in computer science from the University of Pittsburgh and is certified as a Novell network administrator.  *Id.* at ¶ 4.  Plaintiff's role as a LAN/WAN administrator was to provide support under the National Airspace Systems Implementation Support Contract II ("NISC II").  *Id.* at ¶ 15.  The Federal Aviation Administration ("FAA") obtained information resource management ("IRM") support services through the NISC II.  *Id.*  Plaintiff was required to support the service area included within the Pittsburgh Systems Management Office ("PSMO").  *Id.* at ¶ 16.  The area covered by the PSMO included approximately 200 computer users and twenty separate FAA facilities, including (i) ten air traffic towers located in Pittsburgh, PA; Allegheny County, PA; Rochester, NY; Buffalo, NY; Erie, PA; DuBois, PA; Charleston, WV; Martinsburg, WV; Roanoke, VA; and Clarksburg, WV, and (ii) ten systems service centers ("SSCs").  *Id.*

The NISC II is a task order contract.  Pltf's Stmt. of Facts at ¶ 17.  Pursuant to the NISC II, the tasks were "the needs of the FAA facility."  *Id.* (*quoting* Pltf's dep. at 70).  Under the arrangement between Defendant and the FAA, a "government technical interpreter" ("GTI") employed by the FAA identifies the needs of the FAA facilities for IRM support and communicates those needs to the NISC II contractors.  *Id.* at ¶ 18.  The GTI is not authorized to direct NISC II contractors how to perform their responsibilities, but rather presents tasks and, if the task is time-sensitive, a requested completion date.  *Id.*  GTIs are not supervisors of NISC II employees, do not have the authority to hire, fire or discipline them, and may not project a supervisory relationship over them.  *Id.* at ¶ 20.

Plaintiff's GTI was always an FAA employee, and was never employed by Defendant.  *Id.* at ¶ 21.  During her employment with Defendant, the GTIs were Dennis Damp (December

---

[1]  A Local Area Network, or "LAN," consists of a file server and cabling that connects computers within a facility in order to allow users to share programs and information.  Pltf's Stmt. of Facts at ¶ 1.  A Wide Area Network, or "WAN," connects multiple LANs to allow file sharing between facilities.  *Id.*

1997 - December 1998); Dan Vallish (December 1998 - February 1999); and Richard Leonard (February 1999 - January 2002). *Id.* Unlike the GTIs, Plaintiff was "under Lockheed Martin contract, supervision and their payroll, not FAA." Pltf's Stmt. of Facts at ¶ 22 (*quoting* Pltf's dep. at 233). At all relevant times Plaintiff's immediate supervisor or "task order manager" was Dan Hamilton ("Hamilton"), whose office was in New York. *See id.*

The FAA funded two LAN/WAN administrator positions in the Pittsburgh Systems Management Office when Plaintiff was hired. *Id.* at ¶ 24. Approximately six months after Plaintiff was hired, the other LAN/WAN administrator was fired due to time and attendance issues and lack of attention to the FAA customer. *Id.* Plaintiff identified Michael Hester ("Hester") to Defendant as a "good candidate" for the vacant position. *Id.* at ¶ 26. Plaintiff and Hester were co-workers at the University of Pittsburgh for approximately two or three years. Pltf's Stmt. of Facts at ¶ 27.[2] Defendant hired Hester as a LAN/WAN administrator under the NISC II contract in November of 1998. *Id.* at ¶ 32. Hester abruptly resigned in July of 2000 and took a job in New Jersey. *Id.* at ¶ 33. Defendant rehired Hester when he returned to Pittsburgh in July of 2001. *Id.* at ¶ 37.

Plaintiff testified at her deposition that two of her government technical interpreters from the FAA, Vallish and Leonard (who replaced Vallish), made inappropriate sex-based and national origin-based comments. Plaintiff testified that Vallish would make comments like "this work is for women," that he was constantly demeaning and degrading, and that he once commented to Hester about an article which purportedly explained that women cannot do technical work. Pltf's dep. at 237. When Plaintiff reported this conduct to Hamilton, his

---

[2] It is undisputed that Hester was well educated and well qualified for the position of LAN/WAN administrator. *See* Pltf's Stmt. of Facts at ¶¶ 28-31. There is evidence that in some instances Plaintiff's technical abilities exceeded those of Hester, *see, e.g.,* Pltf's exh. O; Pltf's dep. at 132-33; Pltf's Stmt. of Facts at ¶ 66, and that he was out of the office fairly often. Pltf's dep. at 155-56. However, there is no evidence that anyone communicated a complaint against Hester to Defendant due to deficient performance, time and attendance, or for any other reason.

response was "just put up with it, get the work done, make the man happy." *Id*.[3]  As for Leonard, Plaintiff testified that he "would make comments like, when you work with a woman what you have to do is to check the calendar to see what time of the month it is ..." Pltf's dep. at 215.  In January of 2001, after Plaintiff returned from a trip to Iran, Leonard made inappropriate comments about her "making a pilgrimage to Iran," asked whether she would have to cover her face in Iran, and asked whether she would trip because of the cover.  Pltf's dep. 214, 223-24. Plaintiff also testified that Leonard would "constantly make comments about foreign people ..." *Id*.

On December 18, 2000, Plaintiff faxed a written complaint regarding Leonard's conduct to Frank Merrick, the NISC II human resources manager, and to Marvin Miller of the FAA. Pltf's Stmt. of Facts at ¶ 74.  None of the allegations in the December 18, 2000 complaint related to Plaintiff's national origin.  *Id*. at ¶ 75.  The complaint described two alleged incidents in which Plaintiff considered Leonard's conduct to be argumentative or hostile, as well as a few other off-color and inappropriate comments.  *Id*. at ¶ 76.  The FAA Accountability Board conducted an investigation in response to the complaint and sent Leonard to sensitivity training for approximately a week.  *Id*. at ¶ 79.  Leonard was not demoted, suspended or denied compensation or benefits due to the investigation, but he apparently was resentful and demoralized about having to attend sensitivity training.  Pltf's Stmt. of Facts at ¶ 79.  After the training he made sarcastic and disdainful comments about the training, *e.g*., "I'm so sensitive I can cry now," and "oh, I didn't know that black people don't like to be called niggers anymore ..." Pltf's dep. at 189-90; Pltf's Stmt. of Facts at ¶ 80.

The December 18, 2000 complaint was the only "formal" written complaint made by Plaintiff regarding Leonard's conduct.  *Id*. at ¶ 87.  However, on or about February 22, 2001 Plaintiff orally informed Hamilton of Leonard's post-complaint behavior and Hamilton apparently took no responsive action. Pltf's dep. at 209-11.

---

[3]  Plaintiff's Complaint and summary judgment filings do not reference comments made by Vallish, and his behavior is apparently not part of Plaintiff's hostile work environment claim.

4

The record reflects that Plaintiff had some conflicts with Hester.[4]  For example, Plaintiff and Hester had a disagreement on October 15, 2001 over who would take a trip to Roanoke, Virginia.  Pltf's Stmt. of Facts at ¶ 93.  Plaintiff and Hester discussed the disagreement with Hamilton, who reprimanded them for their apparently childish behavior.  *Id*.  Following this disagreement, Hamilton sensed that there was a problem with the relationship between Plaintiff and Hester.  *Id*. at 94.  Hester reported to Hamilton that he was spending so much time with arguments and confrontation that his productivity was affected.  *Id*. at ¶ 94.  At around this time Hamilton asked both Plaintiff and Hester to document the problems that they experienced with each other.  *Id*.  There is no evidence that Hester made inappropriate comments to Plaintiff or anyone else.

In October or November of 2001, Hamilton received complaints from Leonard that Plaintiff was having time and attendance problems.  Pltf's Stmt. of Facts at ¶ 95.  In response to the complaints, Hamilton instructed Plaintiff, as well as other employees who were experiencing similar problems, to annotate the times that they arrived and left work on their time and attendance sheets.  *Id*. at ¶ 96.  On November 19, 2001 Hamilton wrote Plaintiff an e-mail regarding her whereabouts on Friday, November 16, 2001.  *Id*. at ¶ 97.  Hamilton wrote the e-mail in response to a complaint he had received from the FAA's regional IRM Manager, Warren Herman, who had complained that Plaintiff could not be located and did not return any pages or phone messages.  *Id.* at ¶ 97.  Hamilton also informed Plaintiff that Leonard had complained that she had failed to properly coordinate her absence from the office on the day after Thanksgiving, and because Hester was also out of the office there was "no coverage at the SMO."  *Id*. at ¶ 99.  In her response, Plaintiff asserted that she was at work all day, but because Leonard and Hester were out of the office she was unable to take calls as they came in, but nevertheless "returned calls accordingly."  Pltf's Stmt. of Facts at ¶ 97.  On November 27, 2001 Hamilton sent Plaintiff another e-mail advising her that she had not followed the proper procedure for reporting absences

---

[4]  By way of background, Plaintiff and Hester were dating at the time that Plaintiff was hired, but their relationship did not endure.  *See* Pltf's dep. at 35.

when she called in sick that day. *Id*. at ¶ 100. Hamilton asserted that Plaintiff was the only employee who had not followed the proper procedure when she called in sick that day. *Id*. Plaintiff contends that these e-mails were of a "harassing nature." *Id*.

On or about November 26, 2001, Leonard visited Hamilton at Hamilton's office. *Id*. at ¶ 102. Hamilton asked Leonard about complaints that Leonard had made previously regarding Plaintiff's time and attendance. *Id*. at ¶ 103. Issues regarding time and attendance were discussed, and Leonard also mentioned that Plaintiff's technical performance was substandard. Pltf's Stmt. of Facts at ¶ 102. Leonard stated that several FAA managers, including James Cook, Leonard Smith and David Smith, did not want Plaintiff back at their facilities. *Id*. Hamilton asked Leonard to document the complaints, and the next day Leonard sent him an e-mail which described the complaints. *Id*.

Plaintiff contends that Leonard's e-mail contained false information. *Id*. Specifically, the e-mail recites that managers in Elkins and Clarksburg, West Virginia had complaints about Plaintiff's performance, but Plaintiff contends that she never visited those facilities. *Id*. at ¶ 103. Additionally, Leonard's e-mail recitation of problems experienced by James Cook and Leonard Smith differs in some minor respects from their later deposition testimony. *See id.*

Before he became aware of the complaints brought to his attention by Leonard, Hamilton had been contemplating a performance improvement plan for Plaintiff based upon 1) time and attendance problems and 2) Plaintiff's conduct toward Hester. Pltf's Stmt. of Facts at ¶ 104. After he received Leonard's e-mail, Hamilton wrote a memorandum dated December 5, 2001 to Frank Merrick ("Merrick"), one of Defendant's human resources managers, which summarized Plaintiff's allegedly unacceptable performance and recommended that she be given a formal letter of warning and then put on a performance improvement plan. *Id*. at ¶ 106.

Hamilton and Nicholas Luca ("Luca"), another one of Plaintiff's superiors, held a teleconference with Plaintiff on December 11, 2001 to review the terms of her performance improvement plan. *Id.* at ¶¶ 78, 108. That same day, Plaintiff, Hamilton and Luca all signed the performance improvement plan. *Id*. Plaintiff prepared a four-page summary of the teleconference. *Id*. at ¶ 109. Plaintiff forwarded the summary to Merrick, along with an e-mail

6

contesting the propriety of the performance improvement plan. *Id*. In neither the summary nor her e-mail did Plaintiff identify harassment or retaliation by Leonard as having any relation to the matters addressed in the performance improvement plan. Pltf's Stmt. of Facts at ¶ 109.

In October or November of 2001, the FAA engaged two contractors under a separate contract called the National Information Resources Management Augmentation Contract ("NIRMA"), to provide LAN/WAN administration within the area covered by the Pittsburgh Systems Management Office. *Id.* at ¶ 118. The contractor for the NIRMA contract is AMTI, and Defendant is not a participant in the NIRMA contract. *Id*. The purpose of the NIRMA contract was to supplement the FAA's IRM field resources. *Id*.

Plaintiff contends that she was replaced by two individuals who were engaged pursuant to NIRMA shortly before her layoff. *Id*. at ¶ 119. One of the contractors was hired to help with assignments in Charleston, while the other was hired to help with assignments in Buffalo, New York. *Id*. Both contractors provided the same type of IRM support that Plaintiff provided. Pltf's Stmt. of Facts at ¶ 119. The decision to place the NIRMA contractors in Charleston and Buffalo was made by the FAA's regional IRM staff in New York, and Leonard had no role in deciding where to deploy the two new NIRMA contractors. *Id*. at ¶ 20. According to Herman, the NIRMA contractors were placed in Charleston and Buffalo to significantly reduce the amount of travel required to support the outlying facilities. *Id*. at ¶ 21.

The NISC II contract under which Plaintiff was employed is a ten-year contract which is funded on a yearly basis. *Id.* at ¶ 125. For each year of the contract, the FAA requests a certain set of tasks or services for which it allocates funding. *Id.* For the NISC II task order beginning February 1, 2002, the FAA reduced operational funding by over $300,000.00, which required Defendant to eliminate seven (7) full-time positions, including one of the two LAN/WAN administrator positions which were held by Plaintiff and Hester. *Id*. at ¶¶ 126, 161-62. The determination of the support which would be cut was made by the FAA, but Defendant determined who would be laid off or terminated. Pltf's Stmt. of Facts at ¶¶ 126 & 162. Leonard had no role in the decision regarding support staff reduction under the NISC II contract. *Id*. at ¶ 163.

Plaintiff's employment was terminated as of January 31, 2002.  Pltf's dep. at 88.  On November 7, 2003, Plaintiff filed a Complaint which alleges violations of Title VII of the Civil Rights Act of 1964.  Specifically, Plaintiff alleges gender and national origin discrimination, a hostile work environment and unlawful retaliation.[5]  Defendant has moved for summary judgment on all of Plaintiff's claims.

## Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant.  *Celotex*, 477 U.S. at 323.  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party."  *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).  Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence.  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993).

In Title VII actions, the familiar *McDonnell Douglas*[6] formulation regarding the

---

[5]  Plaintiff is a Christian and has not made a claim for religious discrimination.  Pltf's Stmt. of Facts at ¶ 3.  Additionally, paragraph 6 of the Complaint alleges that Plaintiff was removed as an "administrative team lead" for the NISC II employees in July of 2001 due to discrimination and/or retaliation, but Plaintiff now agrees that said removal was not based on unlawful motives.  *Id*. at ¶¶ 90-91.

[6].  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

appropriate burdens of proof and allocation of production of evidence govern and guide the analysis of the evidence presented on a motion for summary judgment.  Under *McDonnell Douglas*, the plaintiff must establish a *prima facie* case of discrimination; if this burden is met, the defendant must then articulate some legitimate, nondiscriminatory reason for the employee's treatment.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant articulates a legitimate, nondiscriminatory reason for the employee's treatment, then the plaintiff must demonstrate that the defendant's stated reasons were a pretext for discrimination.  *Id*. at 804.  The *prima facie* case under *McDonnell Douglas*  "is not intended to be onerous."  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir.), *cert. denied*, 515 U.S. 1159 (1995).  The *prima facie* case raises an inference of discrimination because the courts presume that the challenged acts, if otherwise unexplained, are "more likely than not based on the consideration of impermissible factors."  *Id*.


Discussion

A.    Gender and National Origin Discrimination

Under Title VII it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a); *see also Storey v. Burns Intern. Security Services*, 390 F.3d 760 (3d Cir. 2004).[7]  To establish a *prima facie* case of religious or national origin discrimination under Title VII, Plaintiff must establish that 1) she is a member of a protected class; 2) she was qualified for an employment position; 3) she suffered some form of adverse employment action; and 4) the circumstances give rise to an inference of unlawful discrimination.  *Jones v. School Dist. Of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1995); *see also Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir. 1995).  In order to state a *prima facie* case of sex or gender

---

[7].  The United States Court of Appeals for the Third Circuit has observed that "'[n]ational origin' usually 'refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.'"  *Storey v. Burns Intern. Security Services*, 390 F.3d 760, 763 n.3 (3d Cir. 2004) (*quoting Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973)).

discrimination under Title VII, Plaintiff must establish that: 1) she is a member of a protected class; 2) she was qualified for the position; 3) she suffered some form of adverse employment action; and 4) the circumstances suggest unlawful discrimination, such as when a similarly-situated person not of the protected class is treated differently. *See McDonnell Douglas*, 411 U.S. at 802 & n. 13; *Jones*, 198 F.3d at 410-12. Additionally, the Third Circuit has "repeatedly emphasized that the requirements of the *prima facie* case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances, as when there is a reduction in force.'" *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (*quoting Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)).

Defendant assumes, as will the Court, that Plaintiff will be able to prove a *prima facie* case of sex and national origin discrimination in the context of a reduction in force. Def's Br. at 5. Defendant has clearly articulated legitimate, nondiscriminatory reasons for Plaintiff's layoff/termination. Specifically, Defendant contends that it was required by an FAA budget reduction to lay off either Plaintiff or Hester (which is undisputed), and that Defendant relied upon legitimate, nondiscriminatory criteria in laying off Plaintiff and retaining Hester (which is disputed). *Id.* at 5-8. Defendant contends that Hamilton and Luca compared Plaintiff and Hester based on a variety of objective performance-based criteria and the results "favored retaining Hester over Foroozesh ..." Pltf's Stmt. of Facts at 24.

"[T]o defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could *reasonably* either (1) disbelieve the employer's articulated legitimate reasons for its action, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The *Fuentes* court went on to describe the quantum of evidence required to avoid summary judgment as follows:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons ... was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). To discredit the employer's proffered reason,

> however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.

*Id*. at 764-65 (citations omitted).

In order to satisfy the first prong of *Fuentes*, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id*. at 765 (citations and quotation marks omitted); *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108-09 (3d Cir. 1997 (*en banc*). In order to satisfy the second prong of *Fuentes*, a plaintiff must identify evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller*, 130 F.3d at 1111 (*quoting Fuentes*, 32 F.3d at 762). In other words, to satisfy the second prong a plaintiff "must point to evidence that proves ... discrimination in the same way that critical facts are generally proved - based solely on the natural probative force of the evidence." *Keller*, 130 F.3d at 1111. Finally, in a recent age discrimination case the Third Circuit has reaffirmed the propositions that "the plaintiff must demonstrate that *each* of the employers (*sic*) proffered nondiscriminatory reasons are pretextual," and that a district court may grant summary judgment in favor of the employer notwithstanding the plaintiff's ability to cast doubt upon some, but not all, of the proffered reasons. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (*citing Fuentes, supra*, 32 F.3d at 764) (emphasis in original). The *Kautz* court also reiterated the caveat that a plaintiff can demonstrate pretext "by showing that some of the employer's proffered reasons are a pretext in such a way that the employer's credibility is seriously undermined, therefore throwing all the proffered reasons into doubt." *Id*. (*citing Fuentes,* 32 F.3d at 764 n. 7).

To determine whether a proffered reason for an employment decision is pretextual, "what matters is the perception of the decision maker." *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502

(1993); *see also Fuentes*, 32 F.3d at 766-67 (noting that the state of mind of the relevant decisionmaker must be shown to establish that proffered reasons are, in fact, pretextual).

In order to determine whether Plaintiff has met her burden of proof, the Court must first identify exactly who decided that Plaintiff, rather than Hester, should be terminated (*i.e.*, the decisionmaker). Defendant contends that Hamilton, Plaintiff's supervisor, decided to terminate Plaintiff's employment after he and Luca "conducted an independent investigation into the charges made regarding Plaintiff's performance ..." Def's Br. at 11. Although Plaintiff contends that the investigation was pretextual, and that false information from Leonard was relied upon by Hamilton, she does not dispute that Hamilton was the one who decided that she should be terminated. Pltf's Stmt. of Facts at ¶¶ 127-29, 131-33.

Whether Plaintiff's claims of sex and national origin discrimination survive summary judgment turn upon whether there is any evidence from which a factfinder could reasonably either disbelieve Hamilton's explanation that he conducted an objective evaluation, the results of which "favored retaining Hester over Foroozesh ...," or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of his decision. *Fuentes*, 32 F.3d at 764.

With regard to the second prong of *Fuentes*, Plaintiff is unable to "point to evidence that proves ... discrimination in the same way that critical facts are generally proved - based solely on the natural probative force of the evidence." *Keller*, 130 F.3d at 1111. Significantly, there is no evidence that Hamilton harbored any discriminatory animus toward Plaintiff based on sex or national origin. For example, there is no evidence that Hamilton made any comments about Plaintiff's sex or national origin, or that he cared one way or the other about Plaintiff's sex or national origin. At best, there is very limited evidence that Hamilton was not terribly concerned that Vallish and Leonard may have made inappropriate gender-based comments to Plaintiff, which evidence is insufficient to demonstrate discrimination based on sex or national origin. *See* Pltf's dep. at 237 (Hamilton's response to Plaintiff's complaints about Vallish was "just put up with it, get the work done, make the man happy."); *id*. at 211 (Hamilton took no action in response to Leonard's post-complaint comments).

12

Plaintiff's sex and national origin discrimination claims may also survive summary judgment if a factfinder could reasonably disbelieve Hamilton's explanation that his objective evaluation "favored retaining Hester over Foroozesh ..."  As mentioned earlier, to satisfy this prong "plaintiff cannot simply show that the employer's decision was wrong or mistaken ..." *Fuentes*, 32 F.3d at 765.  There is considerable documentary evidence in this case which indicates that Hamilton objectively evaluated the strengths and weaknesses of Plaintiff and Hester and concluded that Hester was the better overall candidate.  *See, e.g.*, Def's exhs. 44 & 45.  There is no evidence that the factors used to compare Plaintiff and Hester were not relevant to their performance.  *See Kautz*, 412 F.3d at 468 ("An employer may not use evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated ... Absent this type of violation of the *Fuentes* standard, we will not second guess the method an employer uses to evaluate its employees.")

Plaintiff contends that "a reasonable person in Mr. Hamilton's position would have conducted a fair investigation and not relied on Mr. Leonard who had a basis for being biased against Plaintiff."  Pltf's Stmt. of Facts at ¶ 128.  Reliance upon biased or inaccurate information may "show that [Hamilton] was wrong or mistaken," but is not necessarily probative of an intent to discriminate based on sex or national origin.  *Fuentes*, 32 F.3d at 764-65.  As our court of appeals has explained, a plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109; *see also id.* "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge.  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." (*quoting Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir.1996)).

It is undisputed that Hamilton received and reviewed considerable evidence of Plaintiff's allegedly poor technical performance, argumentative behavior toward Hester, time and attendance problems, and administrative non-responsiveness from various sources before she was terminated.  Pltf's Stmt. of Facts at ¶¶ 103, 129, 131-34; exhs. 44 & 45.  On the other hand, Plaintiff contends that her technical performance was generally strong, that she would have heard

13

about allegedly deficient performance at outlying FAA facilities had it truly been deficient, that her late arrivals were infrequent and were due to the weather, that her conflicts with Hester were not unprofessional, and that allegations of non-responsiveness were due to problems beyond her control. Pltf's dep. at 84, Pltf's Stmt. of Facts at ¶¶ 62, 97-98, 139, 142, 145-47, 151, 153.[8] Plaintiff also points to evidence that Hamilton documented his reasons for selecting Plaintiff for dismissal after the decision was made. Pltf's Stmt. of Facts at ¶ 127, 129. Viewed in the light most favorable to Plaintiff, this evidence does not demonstrate that Hamilton's decision was so plainly wrong that it could not have been the true reason for Plaintiff's termination. *Keller*, 130 F.3d at 1109. The disputed facts identified by Plaintiff do somewhat undermine the strength of Hamilton's justification for her termination. However, "[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Id.* (citation omitted). With respect to Hamilton's documentation of his reasons *after* he decided to terminate Plaintiff, our court of appeals has observed that such evidence is not inherently probative of a discriminatory motive. *See Fuentes*, 32 F.3d at 766 ("an employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than devious."); *Billett v. CIGNA Corp.*, 940 F.2d 812, 826 (3d. Cir. 1991), *overruled in part on other grounds*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ("[W]e do not understand why it is improper for an employer to maintain records regarding an employee's conduct even if it recognizes that the record may be helpful in defense against a discrimination claim. Indeed, it would be expected that an employer would do exactly that."). After indepth review, the Court finds that the evidence of weaknesses and inconsistencies in the reasons underlying Hamilton's assessment and decision is not sufficient to create a genuine issue of material fact regarding discriminatory motive. Therefore, the Court will grant summary judgment in favor of Defendant on Plaintiff's claims of sex and national origin discrimination.

---

[8] It is worth mentioning that Plaintiff "cannot survive summary judgment under [the first prong of *Fuentes*] simply by pointing to evidence that could convince a reasonable fact finder that [s]he did as well as [s]he could under the circumstances." *Keller*, 130 F.3d at 1109.

B.    Hostile Work Environment

"The Supreme Court has recognized that Title VII's protection is not limited to 'economic' or 'tangible' discrimination, such as the denial or loss of a job or promotion." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995).  Title VII also prohibits "a work environment abusive to employees because of their race, gender, religion, or national origin." *Id.* (citations and quotation marks omitted).  Plaintiff's hostile work environment claim is summarized as follows in the Complaint:

> Lockheed allowed a hostile workplace to develop at the Pittsburgh office where gender and national origin discrimination, and retaliation for reporting this discrimination, all in the form of inappropriate comments, workplace hostilities and baseless complaints regarding the plaintiff's performance were permitted and tolerated and ultimately the plaintiff was unjustly disciplined twice and eventually separated from the company as a consequence of her continual and vocal opposition to this conduct.

Complaint, ¶ 35.

In *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990), the Third Circuit discussed the standard of liability for a hostile work environment claim.  First, the court of appeals adopted what has become known as a "totality of the circumstances" approach:  "To bring an actionable claim for ... harassment because of an intimidating and offensive work environment, a plaintiff must establish 'by the totality of the circumstances, the existence of a hostile or abusive working environment ...'  *Andrews*, 895 F.2d at 1482 (citation omitted).  In *West*, the Third Circuit noted that its approach has been endorsed by the Supreme Court:

> [W]e can say that whether an environment is "hostile" or "abusive" can be determined only by looking at the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*West*, 45 F.3d at 754 (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).[9]

Similarly, our court of appeals has "deemed it improper to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory animus."

---

[9]  The Third Circuit has observed that there is "no difference in standards applicable to racially and sexually hostile work environments." *West*, 45 F.3d at 753 n.7.

15

*Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006).  Instead, "[b]ecause it is often difficult to determine the motivations of an action, the discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Id*. (citations, quotations and brackets omitted).

Finally, the Third Circuit has established the following elements of hostile work environment claims:

> Five constituents must converge to bring a successful claim for a ... hostile work environment under Title VII: (1) the employee suffered intentional discrimination because of their sex [or national origin], (2) the discrimination was [severe or pervasive],[10] (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex [or national origin] in that position, and (5) the existence of respondeat superior liability.

*Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (*citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990)).[11]

Ordinarily when *respondeat superior* liability is at issue under Title VII, "much turns on whether the harassers are supervisors or coworkers." *Jensen*, 435 F.3d at 452.  "If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action." *Id*. (citation omitted).  However, "[w]hen coworkers are the perpetrators, the plaintiff must prove employer liability using traditional agency principles." *Id*.

(a)    Allegedly Hostile Conduct

Plaintiff contends that Leonard created a hostile work environment, and that he continued

---

[10]  Opinions from the Third Circuit "have often stated that discriminatory harassment must be 'pervasive and regular,'" but, as the Third Circuit recently observed in *Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006) "the Supreme Court's standard is 'severe or pervasive.'" *Jensen*, 435 F.3d at 449 n.3.

[11]  Additionally, the Supreme Court has observed that Title VII is not "a general civility code for the American workplace," and the Court has emphasized that the offensive conduct in a sexually hostile work environment case must be "because of ... sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998).  The same principle applies where, as here, a plaintiff's claim of a hostile work environment is based in part on national origin discrimination.

to subject her to a hostile work environment after her December 18, 2000 complaint about his remarks.  Pltf's Br. at 7.  As mentioned earlier, Plaintiff testified that Leonard "would make comments like, when you work with a woman what you have to do is to check the calendar to see what time of the month it is ..."  Pltf's dep. at 215.[12]  With respect to national origin, Plaintiff testified at her deposition that in January of 2001, after she returned from a trip to Iran, Leonard made inappropriate comments about her "making a pilgrimage to Iran," asked whether she would have to cover her face in Iran, and asked whether she would trip because of the cover.  Pltf's dep. 214, 223-24.  Plaintiff also testified that Leonard would "constantly make comments about foreign people ..."  *Id*.  Additionally, Leonard was not happy about having to attend sensitivity training.  Plaintiff testified as follows:

> Q.    What were those comments?
> A.    For an example, he said, I went to the sensitivity training, I'm so sensitive I can cry now; or, oh, I didn't know that black people don't like to be called niggers anymore; or, well, how was your pilgrimage to Iran, because I went to see my family in January 2001, and just derogatory, inappropriate comment; and every chance he got he made sure that he said, oh, I'm so sensitive, I went to sensitivity training, as though this was a big joke.

Pltf's dep. at 189-90.

Plaintiff also contends that Hamilton contributed to the hostile work environment when he 1) sent "harassing" e-mails to her in late 2001, and 2) placed her on a performance improvement plan on December 11, 2001.  Pltf's Brief at 7.  Plaintiff contends that the following e-mails from Hamilton were retaliatory:

> 1)    An e-mail sent on November 19, 2001 which asked Plaintiff to explain her whereabouts on the previous Friday, which was written in response to a complaint from the FAA's regional IRM manager that Plaintiff could not be located and did not return pages or phone messages.  Pltf's Stmt. of Facts at ¶ 97.
> 2)    An e-mail sent on November 27, 2001 in which Hamilton advised Plaintiff that she had not followed the proper procedure for reporting absences when she called in sick that day.  *Id*. at ¶ 100.[13]
> 3)    An e-mail sent on December 18, 2001 in which Hamilton alleged that Plaintiff did

---

[12]  Plaintiff testified that this particular comment was made in December of 2000, prior to her complaint.  Pltf's dep. at 215.

[13]  Plaintiff forwarded this e-mail to Merrick in Human Resources because she viewed it as harassment.  Pltf's Stmt. of Facts at ¶ 100.

not properly coordinate time off for a doctor's appointment. *Id*. at ¶ 116.  Plaintiff contends that she provided proper notice. *Id*.

Additionally, Plaintiff contends that a warning she received for a late arrival (15 minutes) on December 12, 2001 is "indicative of the harassment campaign and the hostile work environment." *Id*. at ¶ 115.  The record is not clear as to who issued the warning.

### 1)   Hostile Work Environment Created by Richard Leonard

There is evidence that Leonard made numerous inappropriate comments based on sex and national origin.  Defendant contends that Plaintiff's hostile work environment claim must fail because 1) she has not adduced evidence of regular and pervasive[14] harassment directed at her because of her gender or national origin, and 2) because she cannot establish a basis for *respondeat superior* liability.  Defendant's Br. at 21.

The Court does not agree with Defendant's first argument.  The harassment that Plaintiff suffered at the hands of Leonard was, viewed in the light most favorable to Plaintiff, sufficiently pervasive to support a cause of action.

The Court also does not agree with Defendant's second argument.  "An employer is not always liable for a hostile work environment." *Kunin v. Sears Roebuck and Co.*, 175 F.3d 289, 293 (3d Cir. 1999).  *Respondeat superior* in the context of a hostile work environment created by co-workers "connotes notice to the employer" of the allegedly hostile workplace. *Id*. at 293 n.5.  "Under *Andrews*, 'liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action.'" *Id*. at 293-94 (*quoting Andrews*, 895 F.2d at 1486).  Under precedents of the Third Circuit, "when an employer's response stops harassment, there cannot be Title VII liability." *Id*. at 294 (citation omitted).

For the purpose of *respondeat superior* liability, an employer can have either actual or constructive notice of the hostile work environment. *See id.*  Although in *Kunin* the Third Circuit did not articulate a test for actual notice, the opinion indicates that an employee must

---

[14]  As mentioned earlier, "the Supreme Court's standard is 'severe or pervasive.'" *Jensen*, 435 F.3d at 449 n.3.

specifically complain about the allegedly hostile conduct. *See id.* ("Because Kunin did not complain specifically that Lodato, or any employee, was harassing her, her interaction with [her supervisor in which she asked whether cursing was permitted] does not constitute actual notice to Sears."). As for constructive notice, the *Kunin* court held that "there can be constructive notice in two situations: where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer, or where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." *Id.*

Plaintiff complained to Defendant and the FAA about Leonard's conduct on December 18, 2000. Pltf's Stmt. of Facts at ¶ 74; Defendant's exh. 28. The FAA Accountability Board conducted an investigation in response to Plaintiff's December 18, 2000 complaint and sent Leonard to sensitivity training for approximately a week. *Id.* at ¶ 79. Plaintiff testified that the FAA's response to the situation was reasonable. Pltf's dep. at 269 (Q: "Do you consider this to be a reasonable response?" A: "Let me think for a moment. Yes, I do."). She made no other formal *written* complaint regarding discriminatory or harassing behavior by Leonard, but she did complain to Hamilton that Leonard "made fun of the procedure and made derogatory comments toward me." Pltf's dep. at 211. Hamilton was supposed to report these comments to Merrick, but he apparently failed to do so, and he apparently failed to take any action to correct the situation. *Id.* at 211-12. This evidence is sufficient for a reasonable fact finder to determine that Defendant had actual notice of post-complaint harassment by Leonard, but "failed to take prompt remedial action." *Kunin*, 175 F.3d at 293-94. Therefore, Plaintiff's hostile work environment claim, to the extent that it is based upon Leonard's allegedly discriminatory conduct, survives summary judgment.

### 2)   Hostile Work Environment Created by Dan Hamilton

As stated above, Plaintiff alleges that Hamilton created a hostile work environment by sending e-mails which criticized her performance and placing her on a performance improvement plan. Hamilton is Plaintiff's supervisor, and therefore Defendant is strictly liable for his alleged

creation of a hostile work environment. However, Hamilton's actions fall short of that which must be demonstrated to establish a hostile work environment. First, the allegedly hostile actions are completely neutral with respect to Plaintiff's sex and national origin. In other words, Hamilton's actions are not reflective of intentional discrimination because of Plaintiff's sex or national origin. *Weston*, 251 F.3d at 426. Moreover, Hamilton's conduct was neither severe nor pervasive. Three e-mails over the course of a month which relate specifically to Plaintiff's work performance and which have no apparent connection to Plaintiff's sex or national origin, combined with a sex-neutral and national origin-neutral performance improvement plan, do not amount to severe or pervasive discrimination based on sex or national origin. Finally, it is worth mentioning that at all times Hamilton's office was in New York, and the record reflects that he seldom interacted with Plaintiff on a face-to-face basis. *See* Pltf's Stmt. of Facts at ¶ 22; Pltf's dep. at 72 ("Mr. Hamilton only came to Pittsburgh, as far as I remember, for my yearly evaluation, which is sometime in the July/August time frame of each year."). The allegations against Hamilton are readily distinguishable from, *e.g.*, someone like Leonard who worked with Plaintiff in the same office almost every day. Therefore, the Court finds and rules that Plaintiff may not maintain her hostile work environment claim based on the above-referenced actions of Hamilton and summary judgment will be granted.

C.    Retaliation

Title VII, 42 U.S.C. § 2000e-3(a), provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice under this Subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Subchapter.

To establish a *prima facie* case of retaliation, a plaintiff must ordinarily demonstrate that: 1) she engaged in conduct protected by Title VII; 2) the employer took an adverse action against her either after or contemporaneous with the protected activity; and 3) a causal link exists between her protected conduct and the employer's adverse action. *Weston*, 251 F.3d at 430; *see also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (citation omitted).

However, in addition to her theory of "ordinary" retaliation, Plaintiff has also asserted a claim of retaliation based on the theory that Defendant "allowed a hostile workplace to develop at the Pittsburgh office where gender and national origin discrimination, *and retaliation for reporting this discrimination* ... were permitted and tolerated ..."  Complaint, ¶ 35.  In other words, Plaintiff asserts that a hostile workplace was created in retaliation for her complaint about Leonard.  The Third Circuit recently held that this is a viable theory under Title VII's anti-retaliation provision, *i.e.*, 42 U.S.C. § 2000e-3(a).  *Jensen*, *supra*, 435 F.3d at 449 (holding that "harassment that is severe or pervasive enough to create a hostile work environment" violates 42 U.S.C. § 2000e-3(a)).  The Court will analyze Plaintiff's allegations of retaliation under both theories, *i.e.*, "ordinary" retaliation and "hostile work environment" retaliation.

       (a)       <u>"Ordinary" Retaliation</u>

Defendant contends that Plaintiff cannot establish a causal connection between her complaint about Leonard in December of 2000 and her termination/layoff on January 31, 2002.  Def's Br. at 19.  Plaintiff, on the other hand, characterizes her retaliation claim more broadly and contends that Defendant retaliated against her through "harassing emails [and] an unjustified performance improvement plan."  Pltf's Br. at 6.  Plaintiff also contends that "by relying solely on Mr. Leonard's input when deciding to terminate the plaintiff, Mr. Leonard was provided with an opportunity to retaliate against the plaintiff for reporting his harassment."  *Id*. at 7.

Our court of appeals has held that "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) (*quoting Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997)).  Moreover, a temporal relationship between protected activity and an adverse employment action "will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (citations omitted).  Proof of a causal link "is not limited to timing [of the two events] and demonstrative proof, such as actual antagonistic conduct or animus.  Rather, it can be other

21

evidence gleaned from the record as a whole from which causation can be inferred." *Id.* at 281.

Plaintiff does not allege retaliatory conduct by Hamilton prior to the "harassing emails [and] an unjustified performance improvement plan." Pltf's Br. at 6. In October or November of 2001, Hamilton received complaints from Leonard that Plaintiff was demonstrating time and attendance problems. *Id.* at ¶ 95. Hamilton sent the allegedly harassing e-mails to Plaintiff shortly thereafter, in November and December of 2001. Pltf's exh. DD. The time gap of approximately ten months is not *prima facie* evidence of a causal link between her December 18, 2000 complaint, or her informal complaint on February 22, 2001, and the allegedly harassing e-mails. The Court also finds that the record as a whole does not support a causal connection between Plaintiff's complaints and the e-mails sent by Hamilton. There is simply no evidence of a cause-and-effect relationship between the complaints and Hamilton's e-mails in November and December of 2001.

The same evidentiary shortcoming exists with respect to the performance improvement plan. Plaintiff was placed on a performance improvement plan on December 11, 2001, after complaints about her were brought to Hamilton's attention. This occurred approximately ten months after her complaints about Leonard. Pltf's Stmt. of Facts at ¶ 108. As with the e-mails, the time gap of nearly a year is not *prima facie* evidence of a causal link between her December 18, 2000 and February 22, 2001 complaints and the performance improvement plan, and there is no other probative evidence of a cause-and-effect relationship between the complaints and the performance improvement plan.

The final adverse employment action alleged is Plaintiff's termination on January 31, 2002, which was approximately eleven months after her informal complaint. The Court finds that this gap in time is not "unusually suggestive," and therefore is not *prima facie* evidence of a causal connection between her complaint and her layoff/termination. Moreover, the Court has found no other evidence from which one could infer a causal connection between her complaints and her termination/layoff. Also, there is not sufficient evidence that anyone employed by Defendant had a motivation to retaliate against Plaintiff for having made the complaints. Based on the totality of the circumstances, there is insufficient evidence of a causal connection between

Plaintiff's complaints and any adverse action subsequently taken by Defendant.  Therefore, the Court finds that Plaintiff cannot establish a *prima facie* case of "ordinary" retaliation.

Assuming, *arguendo*, that the evidence suffices to establish a *prima facie* case of retaliation, Defendant is nevertheless entitled to summary judgment on this claim.  As with Plaintiff's claims of gender and national origin discrimination, the Court finds and rules that Plaintiff has not demonstrated such weaknesses, implausibilities, inconsistencies and the like in Defendant's legitimate, nondiscriminatory reasons that a fact finder could infer "that the employer did not act for [the asserted] non-discriminatory reasons."  *Fuentes*, 32 F.3d at 765. There is simply insufficient evidence in this record for a fact finder to conclude that Hamilton's legitimate, nondiscriminatory reasons for his actions are pretextual, or that Hamilton retaliated against Plaintiff by sending the e-mails regarding her attendance, placing her on a performance improvement plan and/or terminating her employment.

(b)    "Hostile Work Environment" Retaliation

In *Jensen*, *supra*, the Third Circuit observed that "our usual hostile work environment framework applies equally to [Plaintiff's] claim of retaliatory harassment."  *Jensen*, 435 F.3d at 449.  Thus, to demonstrate unlawful retaliation by way of a hostile work environment, a plaintiff must demonstrate that "(1) she suffered intentional discrimination because of her protected activity;  (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present."  *Id*. (*citing Weston*, 251 F.3d at 426; *Robinson*, 120 F.3d at 1300-01).

The Court has hereinabove explained its conclusion that Plaintiff's hostile work environment claim survives summary judgment, and the foregoing analysis is directly applicable here.  The evidence is sufficient for a reasonable fact finder to find 1) that Plaintiff suffered intentional discrimination due to her December 18, 2000 complaint about Leonard, 2) that the discrimination by Leonard was at least pervasive, 3) that it detrimentally affected her, 4) that a reasonable person would have been affected, and 5) that Defendant had actual notice of post-

complaint harassment by Leonard, but "failed to take prompt remedial action." *Kunin*, 175 F.3d at 293-94; *Jensen*, 435 F.3d at 449. Therefore, the Court will deny summary judgment on Plaintiff's claim of "hostile work environment" retaliation *to the extent that it is based on Leonard's conduct*. However, the Court will grant summary judgment to the extent that this claim is based on Hamilton's conduct.

<u>Conclusion</u>

For the reasons hereinabove set forth, Defendants' Motion for Summary Judgment will be granted in part and denied in part. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PARVIN FOROOZESH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:03cv1703** |
| | ) | |
| **LOCKHEED MARTIN OPERATIONS** | ) | |
| **SUPPORT, INC., a/k/a LOCKHEED** | ) | |
| **MARTIN TECHNOLOGY SERVICES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER OF COURT

AND NOW, this 24th day of March, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that Lockheed Martin Operations Support, Inc.'s Motion for Summary Judgment (*Document No. 55*) is GRANTED IN PART and DENIED IN PART, as follows:

1)   The Motion is **GRANTED** with respect to Plaintiff's claims of sex discrimination, national origin discrimination and retaliatory termination;

2)   The Motion is **GRANTED** to the extent that Plaintiff's hostile work environment claim and hostile work environment retaliation claim are based upon the actions of Dan Hamilton; and

3)   In all other respects the Motion is **DENIED**.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:   James J. Brink, Esquire                    John Newborg, Esquire
      Email: james.brink@att.net                 Email: jdnewborg@aol.com

      Jay D. Marinstein, Esquire                 Patrick L. Abramowich, Esquire
      Email: jmarinstein@foxrothschild.com       Email: pabramowich@foxrothschild.com